[Cite as *State v. Artis*, 2021-Ohio-2965.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY


State of Ohio                                             Court of Appeals No.  L-19-1267

　　　　Appellee                                       Trial Court No.  CR0201801686

v.

Lee Artis, Jr.                                            **DECISION AND JUDGMENT**

　　　　Appellant                                     Decided:  August 27, 2021

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Alyssa Breyman, Assistant Prosecuting Attorney, for appellee.

Lawrence A. Gold, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Appellant, Lee Artis Jr., appeals the October 9, 2019 judgment of the Lucas

County Court of Common Pleas sentencing him to an aggregate term of 17 years in

prison.  For the following reasons, we affirm.

## I. Background and Facts

{¶ 2} In April 2018, Artis was indicted on three counts of rape in violation of R.C. 2907.02(A)(2), all first-degree felonies. The charges arose from sexual assaults on D.V., who was between 13 and 15 years old during the timeframes alleged in the indictment. Count 1 related to penile penetration of the anus, count 2 related to digital penetration of the vagina, and count 3 related to penile penetration of the vagina. Initially, Artis retained attorney R. Lee Roberts Jr. ("Roberts") to represent him. Later, attorneys Anthony McGeorge and Richard Roberts Sr. ("Richard") also entered appearances on Artis's behalf.

{¶ 3} The case was tried to a jury in July 2019. At trial, the state presented the testimony of Detectives David Morford and Rebecca Kincaid of the Toledo Police Department ("TPD"); D.V.'s mother, M.E. ("mother"); sexual assault nurse examiner ("SANE"), Amanda Brigode; D.V.'s "cousin," Ericka Jennings; and D.V. In his defense, Artis presented the testimony of his girlfriend, Blanca Saldivar, and the video deposition of Dr. Warren Metherd. The following facts were established at trial.

### A. Text message testimony and plea offer

{¶ 4} The state's first witness was Detective Morford, the TPD detective who extracted data from mother's cellphone. He testified that the data-extraction report admitted as state's exhibit No. 19 was the report he created by using an extraction tool called Cellebrite on a phone owned by mother, after getting mother's consent to the

2.

extraction.  To obtain the data in state's exhibit No. 19, Morford performed a logical extraction of the data on the phone.  Morford explained that a logical extraction pulls information that is physically present on the device being examined.  A logical extraction does not include any information that is deleted from the device before Cellebrite extracts the data.  After extracting data from mother's phone, Morford did not open the phone to compare the information in state's exhibit No. 19 to the data actually on the phone because, he explained, doing so would cause changes to the phone's operating system and he had no reason to believe that the Cellebrite device was not working properly.

{¶ 5} Among the information that Morford extracted was a series of text messages from February 27 and 28, 2018, between mother's phone and a contact named "Lee." Morford said that the contact name and its associated phone number were pulled from the phone; he did not know if "Lee" was Artis or if the phone number associated with the "Lee" contact was Artis's number.  The court permitted Morford to read the text messages, which contained incriminating statements by "Lee," including:[1]

- "I apologize SO much for so much [mother] I I really do im sitting ova so hurt for breaking your daughters trust n yours ova my dumb ass actions……"

---

[1] The text messages are transcribed exactly as they appear in the trial exhibit.  All spelling, formatting, and grammatical errors appear in the original.

• In response to a message from mother to "Lee" that stated, "Jusr be ready to b picked up today. We bout to b on our way to the hospital n go fromt here. I'm so fucked up over this.this is my baby u touched. U put your fingers in a LITTLE GIRL. Then tried putting your grown Dick in her. You will not get outta this one[,]" "Lee" texted, "Please listen to me [mother] please I just want to tell you my story please"

• In response to a message from mother to "Lee" that stated, "[D.V.] already blames herself for allowing it to happen. * * *," "Lee" texted, "Im not blaming her i would never do that it's my fault"

• After a message from mother to "Lee" that concluded, "I'm just sick[,]" "Lee" responded, "Thts y i want u to hear my side i was so hurt yesterday [when D.V. disclosed the abuse] i couldn't even tlk to u n tell u my side no lies"

{¶ 6} Morford was the only witness on the first day of trial. The next morning, before the trial reconvened, the state put on the record that it had offered Artis a plea bargain the night before, after the jury heard testimony including the incriminating text messages. It offered to let Artis plead to one count of rape with an agreed-upon prison term of five years, which Artis rejected. Roberts confirmed that Artis did not want to take the plea. The court verified with Artis that he had discussed the offer with his

attorneys and explained the total potential sanctions Artis faced if convicted, after which Artis said that he wanted to reject the state's offer. So, the trial continued.

## B. The remainder of the state's case

{¶ 7} When the trial resumed, mother testified that she had known Artis for approximately ten years and that he was a "very good friend * * *." She denied ever having a sexual relationship with Artis. Her children, including D.V., knew Artis and got along well with him. Mother said that Artis "did a lot of picking [D.V.] up and tickling her and playing with her * * *." In 2015, when the state alleged that Artis's abuse of D.V. began, Artis was coming to mother's house two or three times a week and it was not unusual for Artis to be at the house when mother was not there. However, when mother was not home, Jennings—who lived with mother—was. Jennings is an adult who is not related to mother and D.V., but she and D.V. think of each other as cousins.

{¶ 8} D.V. testified that Artis—a "close family friend" whom she had known since she was a young child—began abusing her when she was approximately 13 years old. Before the abuse began, D.V. liked Artis and thought of him as an uncle.

{¶ 9} D.V. said that Artis would come to her house when mother was not home and that Artis would "try to get me to follow him, like he try to get me to go with him, and when he did, like he would try to touch me." When this happened, D.V.'s younger siblings would usually be in another room watching television or playing with Artis's cellphone.

5.

{¶ 10} D.V. recounted several incidents of Artis's inappropriate behavior with her. The first incident, which related to the anal rape charge, happened in one of D.V.'s prior homes. She and Artis were in the kitchen, which D.V. described as "like a narrow hallway." D.V. stood facing the counter and Artis stood behind her. Artis "kept trying to like touch * * *" D.V. while she told him no. She said that Artis was trying to keep her in the kitchen. Eventually, Artis pulled down his and D.V.'s pants, and his "private" "touched" her. She clarified that Artis's penis touched her "butt" and that it "went in a little bit because it gave me like a shock." After this happened, D.V. got away from Artis and went to her room. She said that Artis told her "I'm sorry, I didn't mean to do that." D.V. said that she did not initially tell anyone about this encounter because she was "scared of the output of what would have happened."

{¶ 11} The second incident happened at Artis's house. D.V. and one of her sisters stayed the night with Artis and his girlfriend, Saldivar, so that Saldivar could take them on an outing the next day. D.V. slept on one of the couches in the living room, and her sister slept on the other. During the night, D.V. woke to Artis attempting to remove her pants. D.V. "told him no because my little sister was right there." D.V. was able to stop Artis from removing her pants, and Artis did not do anything else to D.V. that night.

{¶ 12} Next, D.V. generally described Artis's behavior toward her when she lived at another of her former homes. This conduct formed the basis of the digital rape charge. She said that Artis would come to the house when mother was not home and would

6.

distract her younger siblings with his cellphone. According to D.V., while the other children played on the phone, "whenever [Artis] had a chance to if I was alone or anything he would try to touch me or if I was around my sisters he would try to pull me out of the room like to the other room or take me downstairs. There's been a couple times where I'll be sleep and he would try—he would touch me in my sleep or." To clarify the type of touching Artis was doing, the prosecutor asked D.V. the following series of questions:

> [Prosecutor] Where, what kinds of places would he touch you?
>
> [D.V.] My private like down.
>
> [Prosecutor] Down so—
>
> [D.V.] The front area.
>
> [Prosecutor] So that would be your vagina?
>
> [D.V.] Yes.
>
> [Prosecutor] So he would touch you. What would he touch your vagina with?
>
> [D.V.] Either his fingers and a couple times he tried to put his mouth down there.
>
> [Prosecutor] When he would touch you with his fingers were they outside of your body or inside of your body?

[D.V.] Outside I believe. There might have been a couple times he tried to go inside.

[Prosecutor] Did you ever feel his fingers inside your body?

[D.V.] Yes.

{¶ 13} The final incident that D.V. described was the incident that precipitated her disclosure of the abuse to mother. Artis came to the house after work on a weekday. He gave Jennings some money so that she would take D.V.'s younger siblings to the store. D.V. was lying in bed and just waking up when Artis came into her room. She said that Artis sat on the edge of her bed and "kept trying to touch" her, but that Jennings walked into the room and told Artis that he should not be in there. Regardless, Artis stayed in the room after Jennings left. After leaving D.V.'s room, Jennings took some of D.V.'s younger siblings to the store while others stayed behind.

{¶ 14} Once Jennings left, D.V. said that Artis was "holding" and "forcing" her to get her to go downstairs into the kitchen. D.V. described the assault as follows:

[Artis] kept trying to like touch, and I was saying no. And I told him I was going to tell, and he told me I wasn't. And eventually he pulled his pants down, pulled mine down, and then he tried to hurry up and go in, and I felt like a shock, and I ran upstairs, and my mom had walked in like a couple seconds later like after I got upstairs * * *.

8.

She said that Artis entered her "private, the front area," which she clarified referred to Artis's penis entering her vagina. As soon as D.V. felt the "shock," she broke away from Artis, pulled up her pants, and ran up the stairs to her bedroom. D.V. was already in her bedroom when mother came home.

{¶ 15} Jennings also testified to an earlier time when she saw Artis in D.V.'s bedroom. When Artis came over that day, Jennings assumed that he was there to see mother, who was not home. Jennings told Artis that mother would not be back for a while, and she thought that Artis left. Later, Jennings went back upstairs and saw D.V. sleeping in her bed and Artis sitting on the edge of the bed. She told Artis that he should not be in D.V.'s room. Artis did not say anything; he "just looked at [Jennings] crazy." When D.V. came downstairs, Jennings said that D.V. was "acting like he did something to her. She wasn't acting normal. * * * Like she was acting like she was afraid * * *. She wasn't acting like herself."

{¶ 16} In addition to recounting the circumstances of the rapes, D.V. recalled writing a letter to mother disclosing the rapes the day after the final assault happened. She wrote that "someone has been touching [her] in inappropriate ways more and more ever since [she] was 13 * * *" and that "the person who has been doing this to me is lee.... [sic]." D.V. did not immediately give the letter to mother because her siblings were around. She kept the letter to herself "overnight" and then showed it to her best friend, who encouraged D.V. to tell mother and said that she would tell mother if D.V. did not.

9.

Rather than going to mother, though, D.V. showed the letter to Jennings "late at night" while mother was sleeping. Jennings told one of D.V.'s brothers about the abuse. D.V.'s brother texted her to encourage her to tell mother, and also texted mother to tell her that she needed to talk to D.V.

{¶ 17} The next morning, mother asked D.V. about her brother's text messages from the night before, which is when D.V. gave mother the letter. D.V. said that she wrote the letter because "I couldn't bring myself to tell [mother] the whole story face to face." Even after writing the letter, D.V. hesitated to show mother because she still had "that fear in me wondering what was going to happen afterwards." She wrote the letter because she "felt like if I wrote it and just showed or told somebody like it would stop so like, but I was just scared still like of the output of what would happen."

{¶ 18} During cross-examination regarding the letter, D.V. admitted that she did not actually write the letter to mother the day after the final assault. And although D.V. testified that she reported to the SANE that the abuse began when she was 11 or 12 years old, she conceded that her letter, medical records, and initial report to the police all indicate that the abuse began when she was 13 years old. She said that the first time she reported that she was 11 years old when the abuse began was during her interview with Kincaid. On redirect, D.V. clarified that Artis had done things like tickling her thighs when she was 11, but did not insert anything into her body until she was 13.

10.

{¶ 19} After reading the letter, mother called Saldivar to tell her about D.V.'s accusations.  Mother asked Saldivar to come to her house to talk about the letter; Saldivar brought Artis with her.  According to mother, when she showed Artis the letter from D.V., Artis initially denied the allegations and repeatedly asked to talk to D.V., which mother would not allow.  But after mother "yelled at [Artis] like just stop lying, like just admit it,* * * he just broke down and he was shaking and crying and saying like, I don't know what I did, I pulled her pants down, no I didn't pull her pants down.  * * * [H]e just kept saying I didn't—he was like I didn't mean to hurt her, just tell her come here, just let me talk to her."  Rather than continue the conversation with Artis, mother told him to leave.

{¶ 20} D.V. recalled Artis and Saldivar's visit slightly differently.  She testified that

> [m]y mom kept telling me to come out there to tell them like what happened, but I didn't want to face [Artis], so I refused to go out there, and they made him go downstairs and I went—that's when I came out, went to my mom's room with my mom and Blanca, and she was like tell her what happened.  And I told her, and she was just like—she like kept questioning me like about it, like asking me different questions about it, and eventually she just was like I'm sorry.  * * * I don't remember like the whole

conversation. I just know I told her and she was like questioning about it, and they eventually left.

{¶ 21} Jennings testified that she was in her bedroom with D.V. when Artis and Saldivar came to the house. She said that mother's conversation with Artis and Saldivar took place in mother's bedroom with the door open, and that she was peeking her head out of her room while the conversation happened. Jennings overheard mother, Artis, and Saldivar talking about "him touching on [D.V.]." According to Jennings, "[a]ll [she] heard was that [Artis] touched [D.V.] and he didn't mean to." She described Artis as "acting nervous" that day based on "just how he was looking and everything like he was nervous."

{¶ 22} After the confrontation at mother's house, Artis texted mother, and they engaged in the text conversation that Morford testified to. Mother said that Artis was the person whose phone number that she saved in her phone's contacts as "Lee." While reviewing the text messages for the jury, mother also claimed that she had heard rumors that Artis was telling other people that D.V. "was rubbing on [Artis] and pulled his thing out," or that Artis was claiming that any sexual contact with D.V. was consensual.

{¶ 23} The day after D.V. gave mother her letter, mother took her to the hospital for an examination. Amanda Brigode, the SANE who examined D.V., testified that D.V. volunteered information and was alert, oriented, calm, and cooperative during the exam. She said that D.V. avoided eye contact while telling her story, spoke slowly and in a

12.

whisper, was tearful, and talked and cried at the same time. Brigode recorded D.V.'s statement about the rapes in her medical records, which Brigode read during her testimony. According to Brigode's records, D.V. reported that

> [the touching] started when I was 13. He would come into my room at night and put his hands under my blanket and try to push my legs apart and tell me to make room. I didn't know what he was doing. I was scared. Another time he tried to put pulling [sic] my pants down and sticking it in. I think it went in my butt because it hurt really bad. I was able to get away from him. * * * One time he came into my room and was pulling my pants down and he put his mouth down there. I was kicking him to get off me. He put his fingers in me, too. My cousin ended up coming into the room and asked him what he was doing.

Regarding the incident that precipitated D.V.'s report of the abuse, Brigode testified that D.V. reported that

> my mom went to the store and he was there. He gave my sisters his phone so that they could leave us alone—or would leave us alone. He grabbed me by the arm and pulled me downstairs to the kitchen. He held me against the wall and he pulled my pants down. He tried to put it inside me. It went in a little bit and it hurt—and hurt so I jumped and I was able to get away from him.

13.

At trial, D.V. testified that she went downstairs of her own accord, despite telling Brigode that Artis had grabbed her by the arms and dragged her downstairs.

{¶ 24} Brigode's narrative also included D.V.'s identification of Artis as the person who assaulted her, and mother's statements that the "perpetrator" had come to mother's home the day before and that he "eventually became tearful and admitted to having gone too far. Stating that he didn't mean to hurt her." Additionally, mother told Brigode that she "received a phone call from perpetrator's mother this a.m. requesting that she not go to the police." Brigode clarified on cross-examination that she does not "form an opinion" on whether the person the victim identifies as the perpetrator actually committed the assault; she "just simply note[s] what they report."

{¶ 25} Brigode said that she conducted her physical examination of D.V. about six days after the last incident of sexual assault. Because the exam happened more than 72 hours after the assault, Brigode was precluded by state law from collecting forensic evidence. Thus, there was no DNA evidence in this case. During the physical exam, Brigode photographed a bruise on D.V.'s forearm, which D.V. reported was from Artis grabbing her arm during the assault. Because everyone's bodies heal differently, Brigode is unable to predict the rate of healing for bruises. The only other injury that Brigode noted was some tenderness in one area of D.V.'s vaginal wall. Although Brigode could not say for sure what caused the tenderness in that area, she "wouldn't attribute that to [her] exam." She did not see any injuries to D.V.'s hymen. Brigode testified that it is

14.

"rare" to find traumatic injuries in a child's vaginal area because of anatomical reasons and because most people who are sexually assaulted do not fight their attacker. Moreover, if there had been any injury to D.V.'s hymen, Brigode "anticipated that it would have been healed by the time that [she] saw [D.V.] in that six day period."

{¶ 26} Following the SANE exam, mother took D.V. to the police station to report the rapes. Kincaid was assigned to investigate. She met with D.V. and mother several days later. According to Kincaid, mother was "still pretty hot under the collar about the whole incident occurring," while D.V. was "matter of fact, just plain solid like a record, * * * like monotone voice talking about what happened." Kincaid also interviewed Jennings as part of her investigation.

{¶ 27} During D.V.'s interview, she told Kincaid "the story, the same story like when it first happened and like from where it really affected me and pushed me to tell my mom and like I told her the events and like where it happened and what happened and what house and everything." Additionally, mother told Kincaid about the text messages between her and Artis and gave Kincaid her phone so that the TPD could retrieve the messages.

{¶ 28} In addition to interviewing D.V. and mother, Kincaid spoke to Jennings, "reached out to" Artis, and attempted to contact Saldivar. She confirmed that there was no DNA evidence in this case.

15.

{¶ 29} Following Kincaid's testimony, the state rested, and Artis moved for acquittal under Crim.R. 29. His entire argument was that "the State has failed to produce evidence sufficient to support a conviction on Counts 1, 2, or 3." The state responded that it had "presented sufficient evidence regarding each and every element of the offenses of rape charged in the indictment sufficient to put the case before the jury's consideration." The court denied the motion because "given specifically the testimony of the alleged victim and the SANE nurse who testified yesterday, there is sufficient evidence to establish a prima facia case as to each element of the charges before the Court."

## C. Artis's case

{¶ 30} In his defense, Artis called Saldivar to testify and presented the video deposition of Metherd, an obstetrician/gynecologist.

{¶ 31} Before Saldivar testified, the court became aware that she had been in the courtroom the day before, despite the court's separation-of-witnesses order. When the court questioned Saldivar about her presence in court, she claimed that she was unaware that she could not be in the courtroom, she had seen mother and Brigode testify, she did not speak to Artis's lawyers until after court concluded that day, and, although she had spoken to mother, mother did not tell her that prospective witnesses could not be in the courtroom. The court permitted Saldivar to testify, but to remedy the violation of the separation order, the court prohibited the parties from asking questions about testimony

16.

that Saldivar heard the day before. The court also explained the separation order to the jurors and told them that "yesterday [Saldivar] was present in court contrary to this Court's separation order. You are to use this witness's transgression and apply it to her credibility in any way you choose if at all."

{¶ 32} Saldivar testified that she is Artis's girlfriend and that they have two children together. She said that she spoke to mother "[h]ere and there" during the time that they had known each other, but, generally, mother would call or text Saldivar "only when it came to asking to borrow money or to sell food stamps."

{¶ 33} Regarding the night that D.V. and her sibling stayed at Artis and Saldivar's house, Saldivar testified that she and Artis were in bed together when Artis's friend called and asked him to go out. Artis returned around 4:30 a.m. On cross, Saldivar said that Artis was out with friends, but she did not know specifically where he went.

{¶ 34} When the couple got up around 8:00 a.m., the children were all asleep downstairs. The children were still sleeping when Saldivar left to take Artis to work. When she returned from dropping off Artis, the children were awake. Saldivar was pregnant at the time and did not feel up to taking the children on their planned outing, so she and the kids stayed at the apartment all day. Saldivar said that there was nothing out of the ordinary about D.V. that day; D.V. "was calm. She was chill. She was playing with the kids, the two younger kids, watching TV, just playing."

17.

{¶ 35} Regarding the morning that mother disclosed D.V.'s accusations to Artis and Saldivar, Saldivar testified that she received a call from mother asking her to come to mother's home. When Saldivar and Artis got to mother's house, Saldivar said that Artis stayed downstairs while she went upstairs to mother's room. Mother gave Saldivar D.V.'s letter, and Saldivar

> read the letter both sides, and then I told [mother] I said, okay, where do we go from here. And she said, I don't know, I'm a little confused. I don't know what to do. I don't know what to believe. I don't know what to think. And then she said she's going to talk to her daughter and whatever her daughter decided to do was what was going to happen.

Mother then called Artis upstairs. He and mother smoked marijuana while mother continued to talk to Saldivar about D.V.'s accusations. Saldivar said that eventually mother "asked [Artis], she was like did you did do it, why did you do it, and he just said no, and we left [it] at that." Artis did not admit or confess to anything while he was in mother's room.

{¶ 36} Mother continued to talk to Saldivar about the accusations, so Saldivar told Artis to go downstairs and get ready to leave. While Artis was waiting downstairs, Saldivar told mother, "whatever you need to do, whatever you feel you need to do do it. There's nothing I could say or do to change your mind. Just your [sic] the mother do whatever you want to do." At this point, D.V. came into mother's bedroom. Saldivar

18.

said that D.V. sat on the bed and "doesn't say one word." Saldivar told her, "I understand you showed me this letter, okay, do what you got to do, and then I left."

{¶ 37} On cross, Saldivar clarified that Artis never read D.V.'s letter. She thought that mother handed him the letter, "but he didn't read it cause [Saldivar] just told him like it doesn't even matter, just don't worry about it." She reasoned that "anything he had said at that point would have looked bad. So, [she] was doing it on his behalf to not add fuel to the fire at the [sic] point." Artis was "confused, hurt, [and] upset" during the confrontation, but was not crying. Saldivar did not recall seeing Jennings at all while she was at mother's house.

{¶ 38} Additionally, the prosecutor elicited from Saldivar that she had spoken to Artis and his attorneys about her testimony, but had not spoken to Kincaid, any other TPD officers, or the prosecutors about the case. Although the state sent her letters telling her to come in for a pretrial interview, the times and dates chosen by the prosecutors "fell on days that I had to work, and I just couldn't get out of my work schedule. So, it was a personal decision that I made on myself to not appear." While she admitted that Artis was facing serious charges, when the prosecutor asked if Saldivar "didn't think this matter was important enough to miss work or try to get off of work to appear for either of those interviews[,]" Saldivar responded that the "letters don't indicate the severity of why I needed * * * to be interviewed. * * * Yes, the charges are severe. It is, but I have two

19.

children to provide for. I'm sorry, I chose to go to work than [sic] to come do an interview." She also said that no one advised her to not meet with the prosecutors.

{¶ 39} Artis's final witness was Metherd, an expert in the fields of obstetrics and gynecology. He reviewed D.V.'s medical records from the SANE exam and issued his opinions based only on the records.

{¶ 40} Based on D.V.'s report to Brigode that her vagina was penetrated by a "Penis, Finger and Tongue" and there was attempted penetration of her anus by a penis, Artis's attorney asked Metherd if he had opinions on whether these instances of penetration occurred. Metherd testified that it was "hard to be certain" whether D.V.'s vagina was penetrated with a finger because there were too many unknown variables that could affect evidence of digital penetration. Thus, he could not say to a reasonable degree of medical certainty that D.V.'s vagina was penetrated by a finger. Nor could he determine from the information in the medical records whether oral sex had been performed on D.V. However, Metherd believed that penile penetration had not occurred.

{¶ 41} D.V.'s medical records noted that there was "No Acute Injury" to D.V.'s hymen and described the hymen as "Pink, Redundant, Annular, Thick and Fluffy." Metherd said that this description is not indicative of a hymen that had suffered trauma, and he opined that a patient with this type of hymen would not have experienced what counsel called "penile insertive [sic] sex." And, while Metherd would "not necessarily" expect to see acute injuries in the vaginal area approximately one week after a sexual

20.

assault, he would "expect the hymen to have a different appearance if there had been penile penetration." He would also expect the hymen to have a different appearance if it had suffered some type of trauma during digital penetration. Based solely on the description of the hymen, it was Metherd's expert opinion that D.V.'s vagina was not penetrated past the hymen by a penis.

{¶ 42} Metherd also reviewed the photographs that Brigode took of D.V.'s arm. Although he noted "a slight discoloration in one area * * *," he was "having a difficult time seeing a bruise * * *" in the photographs. He said that, assuming a person was grabbed forcefully by the arms and pulled down a flight of stairs, he would "[a]t some point, probably" expect to see a bruise or some type of markings where the person was grabbed.

{¶ 43} Regarding the tenderness of the vaginal wall that Brigode recorded, Metherd said that the tenderness could have resulted from a physical examination of the vagina.

{¶ 44} On cross-examination, Metherd confirmed that he did not examine D.V. himself, but had only reviewed her medical records, although he believed that "[i]t's always better to see the patient yourself for everything." He also admitted that he had never been qualified as an expert in sexual-assault examinations. Metherd had conducted approximately a dozen sexual-assault exams in his career, but the majority of those occurred while he was a medical resident more than 30 years ago.

21.

**{¶ 45}** Metherd could not definitively provide a typical rate of healing for vaginal injuries because healing depends on the type and extent of the injuries. However, based on D.V.'s description of the assault, Metherd said "that does not sound like trauma was inflicted * * *" because he did not "see any indication that [the perpetrator] used any type of foreign object [or] any indication that she expressed that [her vaginal area] was painful" after the assault was over. He said that he would not expect to see injuries to the area six days after the assault if there was no trauma to the area, which he defined as "breaking the skin or putting added pressure on an area that would cause bruising."

**{¶ 46}** Metherd also said that he had "not rendered an opinion on whether an assault occurred. [That] depends on what your legal definition of an assault is." The prosecutor defined intercourse as occurring when there was "penetration, however slight, * * *" and asked if Metherd could give an opinion on whether penile penetration occurred. He responded that "it's fair to say that no penis has gone past that hymen." It became apparent after repeated questioning by the prosecutor that Metherd's opinion was based on the medical definition of the vaginal opening (which is past the hymen), so he was not opining on the occurrence of penetration into any vaginal structures in front of the hymen. Metherd could not opine on whether anal or digital penetration had occurred.

**{¶ 47}** Artis rested after Metherd's testimony. He renewed his Crim.R. 29 motion at the close of his case, arguing that the state "[f]ailed to provide any affirmative evidence that [D.V.] has been penetrated by a penis vaginally. They failed to provide affirmative

22.

evidence beyond a reasonable doubt that [D.V.] has been penetrated by a penis anally. Also failed to provide [D.V.] has been penetrated by a finger." The state responded that it had produced evidence to prove every element of each count. The court again denied Artis's motion on the same basis as before.

{¶ 48} After hearing the evidence, the jury acquitted Artis of count 1 and convicted him of counts 2 and 3.

### D. Artis's motion for a new trial and sentencing

{¶ 49} Following the trial, Artis retained new counsel, Neil McElroy, who moved for a new trial under Crim.R. 33. In his motion, Artis alleged that his attorneys provided ineffective assistance of counsel by relying on a trial strategy that required the admission of specific evidence—the majority of which the trial court excluded—and not telling Artis that there was a possibility that the evidence would be excluded or realizing that the evidence was inadmissible. He claimed that counsel's failure caused him to make an uninformed decision about the plea offer the state made after the first day of trial. Artis also alleged that he was denied a fair trial because, in response to his motion in limine requesting a *Daubert* hearing on Morford's testimony, the state represented that it would not seek to qualify Morford as an expert. At trial, however, the state sought to qualify Morford as an expert, which the court allowed. Artis argued that the admission of Morford's expert testimony without holding a *Daubert* hearing "deprived [him] of full and complete litigation of the issues raised in * * *" his pretrial motions.

23.

{¶ 50} The state responded that counsel's decisions regarding the evidence were trial strategy, and the not-guilty verdict on count 1 tended to show that counsel were not ineffective. The state also argued that, although Morford was qualified as an expert, he did not offer any expert opinions during his testimony. Regardless, Artis invited any error by asking the trial court to voir dire Morford on his qualifications to extract data from cellphones, so Morford was only qualified as an expert because of Artis's actions.

{¶ 51} At the hearing on Artis's motion, Roberts and McGeorge each testified regarding their representation of Artis. Regarding their qualifications, McGeorge testified that he was a sole practitioner who handled "[c]ivil litigation, business litigation, child custody, * * * a little bit of criminal defense, and divorces." The criminal cases he handled were "[m]ainly misdemeanors." At the time of the hearing, he had been practicing for almost four years. Although he had done civil trials, Artis's trial was his only criminal trial. Roberts testified that he was a criminal defense attorney and had been practicing for approximately three years at the time of the hearing. He had done five trials in his career, but Artis's trial was his first felony trial. He did not tell either Artis or his family that it was his first felony trial.

{¶ 52} Artis first hired Roberts to represent him. McGeorge became involved in Artis's case when Roberts approached him about the "possibility of excluding text messages in this matter through motion practice as well as oral motions," which was an issue that McGeorge had previously handled in civil and domestic relations cases.

24.

Roberts said that the evidentiary issues surrounding the text messages were "of the utmost importance." To that end, Artis's defense team filed motions to exclude and a request for a *Daubert* hearing regarding Morford's testimony. Nevertheless, Roberts said that his "entire trial strategy was expecting the text messages to be included." He testified that he never told Artis to expect the texts to be excluded.

{¶ 53} McGeorge discussed with Artis the possibility that the court would overrule his motions related to the text messages. McGeorge did not agree with McElroy's characterization of the text messages as "inculpatory." But McGeorge "believe[d] the text messages were not in a positive light for Mr. Artis and that those text messages should they get in would be more harmful than good." Roberts agreed that "those text messages would be very problematic for [Artis's] case." Later in the hearing, Roberts went further and said, "[o]f course they're practically inculpatory. He practically admits to raping a young girl in them, so, yeah, it's pretty important to [the state's] case."

{¶ 54} Before trial, the state offered to allow Artis to plead guilty to one count of rape with no recommendation for the sentence. Roberts and McGeorge discussed the offer with Artis. McGeorge did not recall specifically what he told Artis about whether to take the plea deal. Roberts explained to Artis the different potential outcomes if he went to trial rather than accept the state's offer, but "[u]ltimately it was his decision because he was the one who was going to have to wear the orange jumpsuit if he was

25.

found guilty." At the time the state made this offer, McGeorge believed that Artis "could be successful at trial if the text messages were excluded."

{¶ 55} After the first day of trial—when Roberts and McGeorge were unsuccessful in excluding Morford's testimony and the text messages were admitted—the attorneys met with the trial judge in chambers to discuss the possibility of a plea. McElroy asked McGeorge if it was "clear that the Judge called everyone in [to chambers] because things just went really bad[.]" As McGeorge was responding, "I wouldn't characterize it as that," the trial judge interrupted with "I would." The court went on to explain that

> I called counsel into Chambers after I heard Detective Morford
> testify and what those text messages alleged when the victim's mother
> writes the text, and I will not quote it correctly, you raped my daughter, and
> his text message back was something to the effect I'm so sorry for my,
> quote, dumb ass actions. I called counsel into Chambers after the jury was
> released, closed the door, and I told the State of Ohio they were going to
> make an offer. They were going to make an offer on this case, and that [the
> defense attorneys] will strongly recommend their client take it. Mr.
> Roberts said that he wouldn't take anything under [sic] 6 years. [The
> prosecutor] said she would be personally offended at anything under 8
> years was offered on this case or was ordered. The next morning [the

26.

prosecutor] comes back with five years.  Less than what Mr. Roberts wanted.  Less than what [the prosecutor] indicated would be offensive.  I am the person who took them in Chambers and told the State of Ohio that they were going to make a better offer than they had made before.

McGeorge agreed with the court's account of the meeting in chambers.  During the meeting, McGeorge told the prosecutors that "if a plea offer between three to five years was presented, it's possible that we could come to a resolution with Mr. Artis accepting that."  Roberts testified that he told the prosecutors that he thought he could get Artis to plead to a charge of unlawful sexual conduct with a minor.  The state indicated that it would let Artis's defense team know later that night if it was willing to offer a plea deal.

{¶ 56} Artis and his attorneys met after the in-chambers discussion to advise Artis of the outcome of the meeting.  McGeorge told Artis that if the state offered a deal that included a three- to five-year sentence, "he should seriously consider it and talk to—talk with his family about it that night prior to making any decision and coming back to court."  That night, the state made an offer for Artis to plead guilty to one count of rape with a five-year agreed upon sentence.  Roberts called Artis to relay the state's offer.  Because he met with Artis after trial that day to discuss the pros and cons of an offer that included a three- to five-year sentence, he did not meet with him again after the state made its offer.  He testified that McGeorge and Richard both thought that Artis should take the plea, but Roberts

27.

was more noncommittal. I left it in his hands because I believe that strongly that he has a constitutional right to a trial, and it's his decision, and * * * he was the one who ultimately would have to go sit for five years if he did take that deal. What I told him was so far from what we've been preparing for nothing has changed. The text messages came in. We thought they were going to come in. We knew that they could be very problematic to your case. If you still believe that you're—if you still strongly say you're innocent, didn't do this, and you want your day in court, let's keep going with the trial. You've had a chance to see what the—how the jury responds to those text messages. If that changes your opinion today, then you need to take this deal.

If the state had offered the unlawful sexual conduct charge, Roberts would have made greater efforts to get Artis to take the plea deal. But he said that "Mr. Artis was adamant that he did not commit this and he was not taking a plea."

{¶ 57} Roberts said that the admission of the text messages did not change his opinion on how the trial would turn out; he still "thought [Artis] was going to have a very tough time being acquitted." He said that he shared his opinion on the outcome with Artis "[i]n not those words, but yes, I believe that was conveyed to him."

{¶ 58} McGeorge also claimed that he and Roberts "did make strong recommendations that [Artis] take a plea. I personally made a strong recommendation

28.

that he should take a plea anywhere between three to five years." But McGeorge did not speak with or visit Artis the night the state made its offer; he had only a brief discussion with Artis the next morning before trial.

{¶ 59} On the second day of trial, Artis's lawyers attempted to impeach mother's testimony by using some printed Facebook posts and screenshots of a text conversation between mother and Saldivar in which mother offered to sell her food stamps to Saldivar. The trial court excluded the exhibits, and Artis's attorneys did not make a proffer of the exhibits. McGeorge believed that the posts and texts were admissible under one of the exceptions to the hearsay rule, although he could not recall which one. According to Roberts, he believed that the text messages would come in through Saldivar's testimony, but they "abandoned that after [Saldivar] gave testimony that was inconsistent with what she had told us previously and which was detrimental to Mr. Artis's case."

{¶ 60} Both attorneys also thought that the Facebook posts were potentially admissible as evidence of mother's character. McGeorge said that they wanted to use the posts to "assist in discrediting [mother's] text messages between herself and Mr. Artis" because mother posted Artis's messages to her, but did not include her messages to him. McGeorge said that they wanted to use the fact that mother posted "doctored" text messages to Facebook to show that "there was the potential that those text messages were doctored prior to the cell phone [sic] being handed over to the detective who did the extraction." However, the attorneys did not subpoena Facebook for records. And,

29.

although they sent a subpoena to one cellphone carrier, when they learned that the carrier did not service mother's phone number at the time the messages were sent, they did not try to subpoena the correct carrier because, according to Roberts, their "strategy changed after that subpoena was sent." McGeorge said that they decided to "us[e] separate evidence in order to try and prove that those text messages [in mother's Facebook posts] were doctored."

{¶ 61} On cross-examination, each attorney said that he discussed with Artis his constitutional rights, the maximum penalties he would face if convicted of all charges, the lesser penalties he would face if he accepted the plea offers, possible defenses to the charges, and evidence for and against his case. Regarding the initial plea offer, the attorneys and Artis decided together that Artis did not want to take the plea because there was no recommended or agreed upon sentence. This was before the trial court ruled against Artis's pretrial motions addressing Morford's testimony, and they "did not believe at that time there would be sufficient evidence if the text messages were excluded to convict him."

{¶ 62} Once the text messages came in, McGeorge said that their plan was to negate the impact of the messages by "attempt[ing] to discredit [mother] as well as discredit Detective Morford." He noted that, although their strategy was not effective on counts 2 and 3, it worked and resulted in a not-guilty verdict on count 1. They also had a plan in place to bolster Artis's testimony if he took the stand, but ultimately Artis opted

30.

not to testify. McGeorge "[e]xplicitly" told Artis that "it would not be a good idea to testify * * *."

{¶ 63} Roberts and McGeorge gave Artis their best advice regarding the pleas, and Artis chose to decline them. According to McGeorge, Artis declined the state's last plea offer because "he advised us that he did not rape or have any sexual contact with [D.V.]." Roberts agreed that Artis was "adamant and denying it." Although McGeorge believed that Artis should take the state's offer, neither he nor Roberts told Artis that he should take the deal, but told Artis that it was up to him. Given the highly damaging nature of the text messages, Roberts said that he "was confident that we were providing him the best defense possible based on his wishes to have a trial."

{¶ 64} Artis's next witness was attorney Ronnie Wingate. Artis attempted to offer Wingate as an expert in criminal defense. The court did not allow it, but recognized Wingate's "experience as learned counsel."

{¶ 65} Wingate agreed with McElroy's characterization of the texts as "particularly inculpatory[.]" In his opinion,

> an acquittal was not going to happen, that in all likelihood [Artis] would be convicted, and if convicted he would be looking at a much higher penalty * * *. With that being said, then at some point you have to decide whether or not you' re going to minimize the damages, and in this case if

31.

the State is ordering a single count of rape with a five year sentence, agreed

upon sentence, * * * then that is something that he should accept.

He indicated that he would inform a client in the same position that "in all likelihood if

you proceed to trial you will be found guilty. And * * * it may not be what you want to

do, but it would be the smartest thing for you to do to accept this plea and resolve this

matter with as minimum damage as possible."

{¶ 66} Due to the inexperience of Roberts and McGeorge, Wingate did not believe

that Artis received effective assistance of counsel at trial.

{¶ 67} Finally, Artis testified in his own behalf. He said that he had not been

through a trial before and relied on his lawyers to inform his decisions. When the state

made its five-year offer, Roberts called Artis and told him that he "shouldn't take it

because he felt like he had a good chance of beating the case * * * [b]ecause he felt like

he had a good strategy to beat it." He claimed that if Roberts had told him that there was

a strong likelihood that he would be convicted, Artis would have accepted the plea deal.

{¶ 68} On cross, Artis conceded that McGeorge told him to accept an offer from

the state that included a three- to five-year sentence. Although he also conceded that it

was his choice to reject the plea offer, he insisted that he only did so because "my lawyer

and I came to a decision that I should deny the offer."

{¶ 69} The trial court asked Artis when he decided he wanted to take the plea deal.

After some back-and-forth between the judge and Artis, Artis admitted that he decided

32.

that he wanted to take the deal after the second day of trial when "everything got in, then nothing they tried their strategies didn't work." He said that he talked to his lawyers about pleading at that point, but Roberts "felt like he had a good chance of getting me basically acquitted." The judge pointed out to Artis that he said during his presentence investigation interview that he wanted a trial "[t]o show [his] innocence." When the court asked if Artis "wanted a new trial to show your innocence. You don't want a new trial so you can plea; is that fair?" Artis responded, "Yeah, but I would take a plea * * *." When McElroy asked a follow up question, Artis clarified that he initially misunderstood the possible outcome of a successful motion for a new trial. He was not asking the court for a new jury trial, but was "asking [the court] to consider giving me the plea so I can take the plea."

{¶ 70} Following the testimony and argument from counsel, the trial court denied Artis's motion. The court noted that it "was not obvious during the trial" that Roberts and McGeorge were defending their first felony trial because "[t]hey objected a lot, to almost everything. And they had arguments. They had case law. They had statutes they would bring up here and argue on the record why I should rule a certain way. And they just didn't win." It also noted that the screenshots of mother's Facebook posts and the text messages between mother and Saldivar were not admitted at trial because they addressed a collateral issue. The court disagreed with Artis's assessment that the text messages between him and mother were what resulted in his conviction. Instead, the

33.

court believed that when D.V. "spoke the way she did in front of this jury [Artis] was going to get convicted. Text messages, no text messages, doesn't make a difference. It's her. It's not pieces of paper that got him convicted." The court concluded that Artis's trial attorneys provided adequate representation because they met the threshold for competence under the Sixth Amendment and that the court's denial of a *Daubert* hearing regarding Morford's extraction of mother's cellphone did not affect Artis's substantial rights because he was not entitled to the hearing. The court also believed that Artis had "buyer's remorse" and would only have accepted a plea deal after he was convicted. That is, it was the jury's verdict—not the advice of counsel—that caused Artis to have a change of heart.

{¶ 71} Immediately after ruling on Artis's Crim.R. 33 motion, the trial court sentenced him to a mandatory eight-year prison term on count 2 and a mandatory nine-year prison term on count 3. The court ordered Artis to serve the sentences consecutively for an aggregate prison term of 17 years.

### E. Assignments of error

{¶ 72} Artis appeals the trial court's decision, asserting three assignments of error:

I. Appellant received ineffective assistance of counsel in violation of his rights under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, §10 of the Constitution of the State of Ohio.

II. The trial court erred in denying Appellant's Crim.R.29 [sic] motion.

III. The jury's verdict was against the manifest weight of the evidence presented at trial.

## II. Law and Analysis

### A. Artis received effective assistance of trial counsel.

{¶ 73} In his first assignment of error, Artis argues that Roberts and McGeorge were ineffective for numerous reasons: (1) they lacked felony-trial experience, but did not disclose that to Artis, and the record is "void of any substantive legal statement, contribution or decision * * *" from Richard, the most experienced attorney on the case; (2) based on the "increased risk of conviction" after the text messages came in on the first day of trial, "it is impossible to justify counsel's lack of any attempt to persuade [Artis] to accept the State's offer * * *"; (3) neither Roberts nor McGeorge was able to articulate their trial strategy to preclude the admission of the text messages between mother and Artis; (4) counsel did not object to the admission of Morford's Cellebrite extraction report; (5) although Roberts said that he wanted to plead to unlawful sexual conduct with a minor, a lesser included offense of rape, counsel did not request jury instructions on the lesser included offense; (6) neither Roberts nor McGeorge was able to articulate their trial strategy to admit the Facebook posts and the text messages between mother and

Saldivar; and (7) counsel did not make a proffer of the Facebook posts or text messages between mother and Saldivar once the trial court excluded them.

{¶ 74} The state responds that (1) Roberts's and McGeorge's inexperience did not cause their performance to fall below an objective standard of reasonable representation, which refutes Artis's claims related to the plea agreement; (2) the majority of Artis's arguments about counsel's strategy are refuted by the record, and, regardless, unsuccessful trial strategy is not a basis for a finding of ineffective assistance; (3) failure to proffer evidence does not automatically make counsel ineffective; and (4) unlawful sexual conduct with a minor is not a lesser included offense of rape, so counsel could not be ineffective for failing to request an unlawful-sexual-conduct jury instruction.

{¶ 75} To prevail on a claim of ineffective assistance of counsel, the appellant must show that counsel's conduct so undermined the proper functioning of the adversarial process that the trial court cannot be relied on as having produced a just result. *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Properly licensed Ohio lawyers are presumed to be competent, *State v. Gondor,* 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, ¶ 62, and there are "countless" ways for an attorney to provide effective assistance in a case, so "'[j]udicial scrutiny of counsel's performance must be highly deferential.'" *State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989), quoting *Strickland* at 689.

36.

{¶ 76} To establish ineffective assistance of counsel, the appellant must show "(1) deficient performance of counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 204. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *State v. Sanders*, 94 Ohio St.3d 150, 151, 761 N.E.2d 18 (2002), quoting *Strickland* at 694.

{¶ 77} Counsel is "strongly presumed" to have rendered adequate assistance and "the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *State v. Smith*, 17 Ohio St.3d 98, 100, 477 N.E.2d 1128 (1985), quoting *Strickland* at 694-695. Generally, trial strategy and tactical decisions—even debatable ones—cannot form the basis of a claim of ineffective assistance of counsel. *State v. Grissom*, 6th Dist. Erie No. E-08-008, 2009-Ohio-2603, ¶ 22. Similarly, counsel's inexperience—alone—is not sufficient to show that counsel was ineffective. *State v. Wilson*, 5th Dist. Delaware No. 2006CA100082, 2007-Ohio-4564, ¶ 55 ("The fact that this case was counsel's first jury trial does not equate to ineffective assistance of counsel. Every attorney has to have a first jury trial." And when a defendant retains counsel, he "cannot fault the inexperience of his own choice of attorney."); *State v. Lopshire*, 11th Dist. Portage No. 2005-P-0037, 2006-Ohio-3215, ¶ 37, quoting *State v. Peoples*, 28 Ohio App.2d 162, 275 N.E.2d 626 (2d

37.

Dist.1971), paragraphs five and six of the syllabus ("'Mere inexperience or unskillfulness, mistakes or errors of judgment, and improper trial strategy in connection with the case are ordinarily insufficient to justify setting aside a judgment of conviction because of the claimed incompetency of retained counsel for the accused" unless "retained counsel's representation has been so inadequate as to make the trial a farce and a mockery of justice * * *.'").

{¶ 78} Initially, we agree with the state that the record contradicts many of Artis's claims of errors by counsel. For example, although Artis claims that counsel could not articulated their trial strategy at the hearing on his motion for a new trial, McGeorge testified to the efforts they made at excluding Morford's testimony and, ultimately, the text messages between mother and Artis. Both attorneys also testified to their (ultimately unsuccessful) plan to impeach mother's testimony. Additionally, Roberts objected to the admission of Morford's Cellebrite report, despite Artis's claim to the contrary.

{¶ 79} We also note that the majority of Artis's complaints relate to counsel's trial strategy. While some of the thought process behind Roberts and McGeorge's trial strategy was flawed, and their strategy was ultimately less successful than they hoped, nothing that counsel did was so far outside of the realm of reasonable representation that it amounted to ineffective assistance. For example, whether and how to cross-examine and impeach a witness is a matter of trial strategy that does not constitute ineffective assistance, *State v. Ford*, 12th Dist. Madison No. CA2019-10-027, 2021-Ohio-782, ¶ 17,

38.

as is whether to object to certain testimony and evidence. *State v. Holmes*, 6th Dist. Lucas No. L-17-1111, 2019-Ohio-896, ¶ 95. Roberts and McGeorge made these types of decisions while defending Artis, and we, as the reviewing court, cannot use hindsight to second-guess counsel's strategic decisions. *State v. Mason*, 82 Ohio St.3d 144, 157, 694 N.E.2d 932 (1998).

{¶ 80} As to the other areas in which Artis argues that trial counsel were lacking, we do not find that Roberts's and McGeorge's actions rose to the level of ineffective assistance. Regarding the state's plea offer after the first day of trial, advice telling a client to either accept or reject a plea deal is not per se ineffective assistance. *See State v. Taylor*, 10th Dist. Franklin No. 14AP-166, 2014-Ohio-3574, ¶ 14-15; *State v. Day*, 2019-Ohio-4816, 149 N.E.3d 122, ¶ 28 (4th Dist.). To establish ineffective assistance in connection with plea negotiations, in addition to showing that his attorneys provided deficient representation, the appellant must demonstrate a reasonable probability that (1) the appellant would have accepted the plea offer, (2) the state would not have withdrawn the offer and the court would have accepted the offer, and (3) the conviction, sentence, or both would have been more favorable to the appellant. *State v. Casey*, 2018-Ohio-2084, 113 N.E.3d 959, ¶ 24 (12th Dist.), citing *Lafler v. Cooper*, 566 U.S. 156, 164, 132 S.Ct. 1376, 182 L.Ed.2d 398 (2012).

{¶ 81} Artis has not shown that his attorneys provided deficient representation by giving him their assessment of his chances of successfully defending against the rape

39.

charges after his text messages to mother were admitted on the first day of trial. Roberts and McGeorge acted reasonably in advising Artis and in not attempting to force him into taking the plea when he continued to profess his innocence. While other attorneys might have handled the situation differently, that does not make Roberts and McGeorge's approach objectively unreasonable. Although Artis testified that Roberts explicitly told him to reject the offer because he thought that they could win at trial, the trial court chose to believe Roberts and McGeorge's testimony over Artis's, classifying Artis's change of heart as "buyer's remorse" when he realized that he was facing far more than five years in prison. Beyond that, as the trial court pointed out, whether Artis would have accepted the plea offer before he was convicted is questionable. Taking all of this into consideration, we cannot find that Artis's trial counsel were ineffective in this regard.

{¶ 82} Artis also fails to show that counsel's relative inexperience resulted in their representation falling below an objective standard of reasonable representation. A lawyer's inexperience does not per se make him or her ineffective because all properly licensed Ohio lawyers are presumed to be competent. *State v. Vunda*, 12th Dist. Butler Nos. CA2012-07-130 and CA2013-07-113, 2014-Ohio-3449, ¶ 61. It is up to Artis to show that his attorneys' lack of experience equated to a lack of competence, which he has failed to do. Roberts and McGeorge effectively argued Artis's case—which resulted in an acquittal on the anal rape charge—cross-examined witnesses, and countered aspects of the state's case. As the trial court noted, it did not know until the hearing on Artis's

motion for a new trial that both Roberts and McGeorge were defending their first felony jury trial, nor was it apparent to the court from Roberts's and McGeorge's performance that they lacked felony-trial experience. The fact that they made some missteps and were not successful in getting Artis acquitted of all three charges does not mean that they were ineffective. Additionally, they had Richard, a seasoned attorney, on the defense team, and Artis does not allege that Richard was incompetent or ineffective, simply that the record does not show that Richard made any affirmative contributions to his case. An allegation that only part of the defense team was ineffective weighs against a finding that a defendant received ineffective assistance of counsel. *See id.* Because Artis has not met his burden of showing that his attorneys' inexperience caused their representation to fall below an objectively reasonable standard of representation, we find that counsel was not ineffective in this regard.

{¶ 83} Next, Artis argues that counsel should have requested a jury instruction on the lesser included offense of unlawful sexual conduct with a minor. "[F]ailure to request an instruction for lesser included offenses without more does not establish ineffective assistance of counsel." *State v. White*, 6th Dist. Lucas No. L-06-1363, 2008-Ohio-2990, ¶ 62, citing *State v. Griffie*, 74 Ohio St.3d 332, 333, 658 N.E.2d 764 (1996). Something "more" could include, for example, "evidence that the failure to make the request was a reason other than trial strategy." *Id.* But when the defendant is not entitled to the lesser

41.

included instruction, counsel is not ineffective for failing to make the request. *See State v. Shadoan*, 4th Dist. Adams No. 03CA764, 2004-Ohio-1756, ¶ 67.

{¶ 84} In this case, Artis was not entitled to a jury instruction on unlawful sexual conduct of a minor because it is not a lesser included offense of forcible rape. "An offense that includes an element that another offense lacks cannot be a lesser included offense of that other offense." *State v. Owens*, 162 Ohio St.3d 596, 2020-Ohio-4616, 166 N.E.3d 1142, ¶ 8. Unlawful sexual conduct with a minor in violation of R.C. 2907.04(A) includes the element that "the offender knows the [victim] is thirteen years of age or older but less than sixteen years of age, or the offender is reckless in that regard." Forcible rape in violation of R.C. 2907.02(A)(2) does not include an age element. Thus, unlawful sexual conduct with a minor is not a lesser included offense of rape charged under R.C. 2907.02(A)(2), and Artis was not entitled to the jury instruction that he claims his trial attorneys should have requested. And because Artis was not entitled to the instruction, his counsel's representation was not deficient because they failed to request it. Artis's argument to the contrary lacks merit.

{¶ 85} In addition, Artis argues that Roberts and McGeorge were ineffective for failing to proffer mother's Facebook posts and texts to Saldivar after the trial court ruled them inadmissible. Failing to proffer excluded evidence is not per se ineffective assistance. *State v. Warren*, 8th Dist. Cuyahoga No. 83823, 2004-Ohio-5599, ¶ 31. When a proffer would not help the defendant's case, counsel's failure to proffer does not

42.

make their performance deficient. *State v. Rutledge*, 10th Dist. Franklin No. 17AP-590, 2019-Ohio-3460, ¶ 42. Here, Artis does not allege how a proffer of the exhibits—which are in the record because they were used at the hearing on Artis's motion for a new trial—would have helped his case. The trial court correctly ruled that the Facebook posts and text messages were inadmissible, so even assuming that the failure to proffer was not objectively reasonable, any error by counsel in that regard was harmless.

{¶ 86} Finally, Artis argues that "counsels [sic] errors were cumulative based on inexperience and but for said errors, his case would have resulted in resolution by plea agreement." Under the cumulative-error doctrine, "a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal." *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 223. We have not found that Roberts and McGeorge's performance was deficient during the trial, so there are no errors that collectively resulted in prejudice to Artis.

{¶ 87} Because none of Artis's allegations of ineffectiveness by Roberts and McGeorge fall below an objectively reasonable standard of representation, he cannot show that his trial attorneys were ineffective. His first assignment of error is not well-taken.

## B. The trial court properly denied Artis's Crim.R. 29 motion.

{¶ 88} In his second assignment of error, Artis argues that the trial court erred by denying his Crim.R. 29 motion because the "evidence introduced by the State of Ohio in this matter is essentially the letter and statements of D.V. which were unsupported by any physical evidence or witness corroboration." The state responds that D.V.'s testimony was sufficient to prove the elements of rape.

{¶ 89} A motion for acquittal under Crim.R. 29(A) challenges the sufficiency of the evidence. *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 39. The denial of a motion for acquittal under Crim.R. 29(A) "is governed by the same standard as the one for determining whether a verdict is supported by sufficient evidence." *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 37.

{¶ 90} Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). In reviewing a challenge to the sufficiency of evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Internal citations omitted.) *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). In making that determination, the appellate court will not weigh the evidence or assess the credibility of the witnesses. *State v. Walker*, 55 Ohio St.2d 208, 212, 378 N.E.2d 1049 (1978).

44.

**{¶ 91}** Artis was convicted of rape under R.C. 2907.02(A)(2), which requires the state to prove that the defendant engaged in sexual conduct with another by compelling the other person to submit by force or threat of force.

**{¶ 92}** As applicable here, "sexual conduct" means "vaginal intercourse between a male and female; * * * and, without privilege to do so, the insertion, however slight, of any part of the body * * * into the vaginal * * * opening of another. Penetration, however slight, is sufficient to complete vaginal * * * intercourse." R.C. 2907.01(A).

**{¶ 93}** "Force" is defined as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1). "A defendant purposely compels another to submit to sexual conduct by force or threat of force if the defendant uses physical force against that person, or creates the belief that physical force will be used if the victim does not submit." *State v. Schaim*, 65 Ohio St.3d 51, 600 N.E.2d 661 (1992), paragraph one of the syllabus. "The law is clear: *any amount of physical force or threat of physical force, however slight, is sufficient to support * * **" a rape conviction under R.C. 2907.02(A)(2). (Emphasis sic.) *State v. Heiney*, 2018-Ohio-3408, 117 N.E.3d 1034, ¶ 122 (6th Dist.). Additionally, when the victim is a child and the offender is a trusted adult, "'force need not be overt and physically brutal, but can be subtle and psychological. As long as it can be shown that the * * * victim's will was overcome by fear or duress, the forcible element * * * can be established.'" (Ellipses sic.) *State v. Griffith*, 10th Dist. Franklin No. 05AP-1042, 2006-

Ohio-6983, ¶ 17, quoting *State v. Eskridge*, 38 Ohio St.3d 56, 58-59, 526 N.E.2d 304 (1988).

{¶ 94} Here, Artis was convicted of digital and penile rape. To support the digital rape charge, the state presented testimony from D.V. that Artis put his fingers inside her vagina. That is, D.V. testified that Artis would try to "touch" her "whenever * * * [she] was alone" or he would "try to pull [her]" into another room away from others, and that on a few occasions he would "touch [her] in [her] sleep." She clarified that Artis would "touch" her on these occasions with his fingers or his mouth, and that he tried to put his fingers inside of her "a couple times" and that she felt his fingers inside her vagina. This is sufficient to prove the penetration element of the digital rape charge.

{¶ 95} We also find sufficient evidence to support the element of physical force. Although D.V. did not testify regarding the specific physical force that accompanied each instance in which she felt Artis's fingers inside her vagina (some of which may have been initiated while she was asleep), D.V.'s medical records—which were read into evidence by Brigode—detail the physical force that accompanied at least one instance of digital penetration. According to the medical records, D.V. stated that Artis "would come into my room at night and put his hands under my blanket and try to push my legs apart and tell me to make room" and "[o]ne time he came into my room and was pulling my pants down and he put his mouth down there. I was kicking him to get off me. He put his fingers in me, too." Artis's removal of D.V.'s pants is sufficient evidence of force. *State*

46.

*v. Roberson*, 6th Dist. Lucas No. L-16-1131, 2017-Ohio-4339, ¶ 67. Indeed, even if D.V. had been asleep when this incident began, the manipulation of a sleeping victim's body or clothing to facilitate sexual conduct is sufficient evidence of force. *State v. Burton*, 4th Dist. Gallia No. 05CA3, 2007-Ohio-1660, ¶ 38 (manipulation of a sleeping victim's clothing to facilitate sexual conduct is sufficient force to support a conviction under R.C. 2907.02(A)(2)); *see also Heiney* at ¶ 124 (finding manipulation of victims' clothing was sufficient force to support gross sexual imposition convictions).

{¶ 96} As to the penile rape charge, D.V. testified and reported to Brigode that Artis grabbed her arm or arms and pulled her downstairs before holding her against a counter, removing her pants, and forcing his penis into her vagina. This is sufficient to meet the force element of penile rape.

{¶ 97} Regarding the penetration element of penile rape, D.V. specifically testified that she felt Artis's penis enter her body. Although Metherd testified that D.V.'s hymen did not have the appearance of a hymen that had been penetrated by an adult penis, so Artis's penis could not have entered her vaginal opening, it was clear from his testimony that he was referring to the *medical*—rather than *legal*—definition of "vaginal opening." That is, Metherd defined the hymen as the point at which the vagina began. However, "[c]ourts have consistently held that vaginal penetration is proved when any object is applied with sufficient force to cause the labia majora [the external female genitalia] to spread." *State v. Patterson*, 5th Dist. Tuscarawas No. 2020 AP 12 0025, 2021-Ohio-

47.

2387, ¶ 24.  In other words—although perhaps medically imprecise—legally, the vagina begins at the external genitalia, not some deeper internal structure.  Thus, D.V.'s testimony that she felt Artis's penis inside of her body is sufficient evidence of penetration to support the penile rape charge.

{¶ 98} Ultimately, Artis's argument regarding his Crim.R. 29 motion comes down to D.V.'s credibility, which we cannot consider when weighing the sufficiency of the evidence.  Considering the evidence in the light most favorable to the state, we find that a "rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."  (Internal citations omitted.)  *Smith*, 80 Ohio St.3d at 113, 684 N.E.2d 668, so the trial court properly denied Artis's Crim.R. 29 motion.  Thus, his second assignment of error is not well-taken.

### C.  Artis's convictions are not against the weight of the evidence.

{¶ 99} Finally, in his third assignment of error, Artis argues that his convictions are against the manifest weight of the evidence because (1) the jury did not give appropriate weight to evidence that mother deleted text messages from her phone before giving it to Morford; (2) Morford "was not actually trained in Cellbrite [sic] cellphone data extraction until after he performed the extraction * * *" on mother's phone; (3) Brigode "did not collect physical or medical evidence and did not indicate any physical injuries to D.V. * * *"; and (4) the jury focused on the perception—supported only by

48.

D.V.'s testimony—that Artis was a "bad person that had groomed D.V. for sexual conduct from an early age."

{¶ 100} The state responds that, when considering the evidence and the credibility of the witnesses, the jury did not lose its way and create a manifest miscarriage of justice by convicting Artis.

{¶ 101} When we review a claim that a verdict is against the manifest weight of the evidence, we weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541. We do not view the evidence in a light most favorable to the prosecution. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson,* 6th Dist. Lucas No. L-10-1369, 2012-Ohio-6068, ¶ 15, citing *Thompkins* at 387. Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 102} Although we consider the credibility of witnesses under a manifest-weight standard, we must, nonetheless, extend special deference to the jury's credibility determinations, given that it is the jury that has the benefit of seeing the witnesses testify,

49.

observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 6th Dist. Lucas No. L-10-1162, 2012-Ohio-616, ¶ 14. The jury, as the finder of fact and the sole judge of the weight of the evidence and the credibility of the witnesses, may believe or disbelieve all, part, or none of a witness's testimony. *State v. Caudill*, 6th Dist. Wood No. WD-07-009, 2008-Ohio-1557, ¶ 62, citing *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964).

{¶ 103} After reviewing the evidence and the credibility of the witnesses and weighing the testimony, we are not convinced that the evidence weighs heavily against a conviction. First, there was no evidence that mother deleted text messages that were relevant to the rape charges against Artis. The messages that she might have deleted related to her attempts to sell her food stamps to Saldivar. On cross-examination, mother admitted that she had offered to sell food stamps to Saldivar, which the jury was entitled to weigh as it saw fit.

{¶ 104} Second, contrary to Artis's argument, Morford was *trained* in Cellebrite extraction before extracting mother's phone, although he was not *certified* by the company until after the extraction. There is nothing in the record to show that a person using Cellebrite to extract a cellphone must be certified by Cellebrite before performing the extraction. Nor is there any evidence that Morford lacked the necessary training and skills to use Cellebrite, so this argument lacks merit.

50.

{¶ 105} Third, Brigode testified that she was precluded by law from collecting physical evidence, such as DNA, during D.V.'s exam because the sexual assault occurred more than 72 hours before the exam. Because D.V. was examined six days after the rape, it is reasonable to infer that any physical evidence that existed at the time of the rape was no longer on D.V.'s body. Additionally, the brevity of the rape and the passage of time makes it reasonable to infer that any injuries D.V. might have sustained in her vaginal area were healed by the time of the exam.

{¶ 106} Finally, Artis argues that the jury perceived him as a bad person who had groomed D.V. from a young age based solely on D.V.'s testimony. There is no way of knowing if the jury perceived Artis as a "bad person." As far as grooming behaviors, D.V., mother, and Jennings each testified to things that Artis did that might have groomed D.V. for sexual conduct, such as tickling D.V.'s thighs and giving her siblings his phone so that they would leave him and D.V. alone. Any perception the jury had of Artis as engaging in this behavior was based on more than just D.V.'s testimony.

{¶ 107} In sum, after weighing the evidence and the credibility of the witnesses, we cannot say that the jury lost its way or created a manifest miscarriage of justice by convicting Artis of two counts of rape. We find, therefore, that Artis's conviction is not against the manifest weight of the evidence. Thus, his third assignment of error is not well-taken.

### III.    Conclusion

{¶ 108} Based on the foregoing, the October 9, 2019 judgment of the Lucas County Court of Common Pleas is affirmed. Artis is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.

_____
JUDGE

Christine E. Mayle, J.

Gene A. Zmuda, P.J.
CONCUR.

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.