[Cite as *State v. Barahona-Lara*, 2024-Ohio-3048.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY


| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2023-10-069 |
| - vs - | : | O P I N I O N<br>8/12/2024 |
| | : | |
| JOSE M. BARAHONA-LARA, | : | |
| Appellant. | : | |


CRIMINAL APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
Case No. 2022 CR 1093


Mark J. Tekulve, Clermont County Prosecuting Attorney, and Nicholas Horton, Assistant Prosecuting Attorney, for appellee.

Christopher Bazeley, for appellant.



**PIPER, J.**

{¶ 1} Appellant, Jose Barahona-Lara, appeals his conviction in the Clermont County Court of Common Pleas after a jury found him guilty of seven counts of first-degree felony rape and three counts of third-degree felony gross sexual imposition ("GSI"), all of which appellant perpetrated against an under 13-year-old child.

**Facts and Procedural History**

{¶ 2} On December 8, 2022, the Clermont County Grand Jury returned a multi-count indictment against appellant. Counts 1 through 8 of the indictment charged appellant with eight counts of first-degree felony rape in violation of R.C. 2907.02(A)(1)(b).[1] Counts 9, 10, and 11 of the indictment charged appellant with three counts of third-degree felony GSI in violation of R.C. 2907.05(A)(4). The charges arose after the under 13-year-old victim, Rachel, disclosed to her teacher that appellant had been sexually abusing her while they were both living in the same home located in Clermont County, Ohio.[2] This included Rachel alleging appellant had digitally raped her multiple times with his fingers and had touched her breasts on at least three separate occasions. Rachel alleged that during the assaults, appellant was "checking" her breasts and vagina for cleanliness and signs of disease.

{¶ 3} The matter proceeded to a four-day jury trial, during which the jury heard testimony from several witnesses. The testimony revealed that appellant became romantically involved with Rachel's mother when Rachel was 5 years old. Since that time, appellant was in loco parentis of Rachel in a role as her stepfather. In April 2021, when Rachel was ten years old, her mother died of uterine cancer. Per her mother's wishes, Rachel remained in appellant's custody after her mother's death.

{¶ 4} Prior to her mother's death, Rachel became "terrified" of appellant after witnessing several instances of physical abuse between appellant and her mother. In addition to observing appellant yell at her mother, Rachel also saw appellant strike her with a belt, broom, and a charger cord. Appellant would also yell at and kick Rachel's

---

1. Count 2 of the indictment was dismissed after the state's case in chief.

2. For readability purposes, and to protect the victim's identity, we will not use the victim's name or initials, but will instead refer to the victim as "Rachel" throughout this opinion.

dog. After her mother's death, Rachel described appellant as "more upset" and "angry a lot." Appellant would tell Rachel he did not have a family and would call her a "piece of shit." Rachel recalled one occasion where appellant grabbed a three-foot sword and placed it on top of her head. Although appellant eventually took the sword down and did not say anything, Rachel testified she believed she was going to die. Rachel further testified that appellant would punish her with his belt, oftentimes hard enough to leave scars on her shoulder, thighs, and legs. At some point, appellant's actions led Rachel to engage in self-harm, which continued until she was placed in a foster home.

{¶ 5} Rachel, who was 12 years old at the time of trial, testified to the sexual abuse that appellant had inflicted upon her. Regarding the allegations of digital penetration, Rachel described multiple occasions where appellant had touched her body in a way that she did not like. In so doing, Rachel testified that "[appellant] told [her] he wanted to look at [her] privates to see if [she] was, like, wiping [herself] and, like, making sure that it was clean." During these encounters, appellant would tell Rachel to take off her pants and underwear, lay on his bed, and spread her legs. Appellant would then "check" her vagina by using a "spreading motion" with his fingers on her vagina's "outside lips" and "look[ing] around with his eyes and then mov[ing] to the smaller lips and look around." During her testimony, Rachel demonstrated for the jury, using a tissue box, how appellant touched her during these "checks."

{¶ 6} Rachel testified that, at one time, she suffered from a medical issue in her vaginal area. Rachel informed a family friend of her vaginal issues, who suggested Rachel see a doctor. After Rachel spiked a fever and became swollen "down there," appellant took Rachel to the doctor where she was diagnosed with Upschutz Ulcers, i.e., ulcers of the vagina. After using medication, the issue was resolved. Notwithstanding Rachel's medical issue, the testimony revealed that appellant began conducting the

vaginal "checks" on Rachel prior to the presentation of these ulcers and continued after the ulcers should have been healed.

{¶ 7} Rachel testified to seven specific occasions where appellant performed a "check" of her vagina, and explained that, although the checks occurred more than seven times, she could not remember details. Rachel also described three occasions where appellant checked her breasts for cancer, during which he commented that her nipple looked like someone had bitten it, noted that she had stretch marks on her breasts, and asked her if she was horny. Rachel testified that appellant asked her if she was horny after he had "checked" her private and "then he looked to see" if she was "horny" by touching her nipple. Rachel did not know what it meant to be "horny," but appellant told her "something about . . . her nipple," and "that's how you know when a girl's horny."

{¶ 8} Rachel testified that the last time appellant assaulted her, she was lying down in appellant's bed without any pants or underwear. At that point, "he touched [her] vagina and got aggravated because [she] kept moving up . . . trying to get him off - - like his hands off of [her] vagina . . . and he was, like, he moved away from [her] and he was kind of close to his closet and the door and he took off his pants and his [penis] came out . . ." At that time, Rachel was crying because she "just didn't want to do it anymore," and "thought that [she] was going to get raped."

{¶ 9} Shortly thereafter, Rachel disclosed the abuse to a close friend and her homeroom teacher. Rachel's teacher reported the disclosure to Child Protective Services of Clermont County ("CPS") and the Union Township Police Department was notified. CPS opened an investigation into Rachel's allegations and concluded Rachel was not safe in the home with appellant. Rachel was removed from the home that day and was briefly placed in the home of a family friend before beginning a foster placement outside of the school district.

{¶ 10} Due to the nature of the allegations, CPS referred Rachel to the Mayerson Center at Cincinnati Children's Hospital to complete a forensic interview. There, Rachel was interviewed by medical professionals, including Ashley Cremeans, a social worker and forensic interviewer who heard Rachel's account of the sexual abuse and recorded the interview. A redacted version of the interview was played for the jury and admitted into evidence without objection.

{¶ 11} CPS filed for emergency temporary custody of Rachel while an investigation into Rachel's allegations ensued. CPS's complaint was based upon concerns that appellant was "physically examining [Rachel], where he would take his fingers and check the outside of her vagina as well as the inside of her vagina." According to CPS, appellant told Rachel these checks were to "ensure that she was safe – and that she was not going to become sick like her mother was." The matter was set for an adjudication hearing, which was scheduled for December 8, 2022. A CPS intake investigator testified that the adjudication hearing is a "very important part of the dependency process," as that is when a parent would state why his child was not abused or neglected and the court would decide the issue.

{¶ 12} An investigator with the Union Township Police Department testified that he was responsible for investigating Rachel's allegations, and in so doing, learned that appellant was "getting ready to leave the country." Based upon this information, in addition to Rachel's statements during her forensic interview and to the police, the investigator obtained a search warrant for appellant's home. On December 2, 2022, the investigator and other officers executed the search warrant, which yielded items that corroborated parts of Rachel's allegations, including a collection of knives and swords, as well as medical cream next to her bed. Officers also discovered evidence that appellant planned to leave the country, including suitcases packed with sentimental items and the

fully executed titles for his vehicles. Officers also found a folder hidden under appellant's bed sheet, which contained appellant's passport and Covid-19 vaccination card, as well as flight details for a one-way ticket to El Salvador on December 4, 2022 in appellant's name.

{¶ 13} In appellant's case-in-chief, Officer Keith Puckett with the Union Township Police Department testified that he responded to appellant's home on November 18, 2022. When he arrived, he was briefed by CPS that he was there to remove a child due to some sexual allegations. The officer described appellant as helpful, complicit, and non-aggressive during their interaction.

{¶ 14} Appellant then took the stand and described his daughter and stepfather relationship with Rachel. After Rachel's mother passed away, appellant's relationship with Rachel became tougher, as Rachel became more involved with activities and friends that did not meet with his approval. Appellant stated he typically punished Rachel by "giving her the belt," and described a recent occasion where he did not do so, even though Rachel had been caught vaping at school.

{¶ 15} Regarding Rachel's history of vaginal ulcers, appellant testified he became aware of her medical condition when she began having high fevers, up to 100.3 degrees, for two or three days. At that point, he told Rachel to take her clothes off and "get a cold shower." Rachel informed appellant that she thought she had an infection, which prompted appellant to purchase creams and wipes from the pharmacy. When he returned home, he told Rachel: "I'm sorry, [Rachel] but I'm going to have to see . . . what this infection is about . . . . I told her she needed to remove her pants and underwear so I could see." At that point, appellant discovered Rachel's "lips" were "inflamed down there," and he immediately considered that it could be cancer. Appellant denied touching Rachel, and stated he took her to the hospital at that point. The doctor informed appellant

that Rachel was inflamed and that he found "sores" on her skin. The doctor prescribed medication to reduce the inflammation.

{¶ 16} Appellant testified that, after her visit to the doctor, Rachel asked him to check her because she "felt a sting." Appellant then described the following:

> I said, okay well, let me – let me see. She then asked me, so how do I – how do I do it? And I'm sorry. As a father, that's something that you would want to do. Because - - but honestly, because of the fear for everything that had happened, I did ask her – ask her to open her legs. And I told her to use her fingers . . . I grabbed her hand and I told her to use her fingers to show me what she was referring to. And then I noticed that she has some scabs . . . and I reminded her that the gynecologist told us that this was going to happen.

Appellant unequivocally denied touching anywhere in between Rachel's legs.

{¶ 17} Appellant also testified he had "checked" an abnormal pimple on Rachel's breast, at her request, and asked her if she was horny given the stimulated appearance of her nipple. At that time, appellant told Rachel, "don't be like that. I am like your dad." He then told Rachel to check herself often because she could get cancer.

{¶ 18} On cross-examination, appellant acknowledged he is not a doctor, but claimed he was very worried about Rachel developing cancer. Appellant also discussed asking Rachel if she was "horny," during which he indicated that Rachel was an adolescent girl, and in terms of what he was able to do and see, he "[could] tell when someone is attracted to someone." Although he did not "know for sure" whether his stepdaughter, then 9, 10, or 11 years old, was attracted to him, he claimed a lot of "weird" things were happening.

{¶ 19} Regarding the plane ticket, appellant testified he purchased the one-way ticket to El Salvador because it had been 12 years since he had seen his mother. He claimed she was all he had left since his wife was deceased and Rachel had been

removed from his care. According to appellant, the reason he bought a one-way ticket was because he is an illegal citizen and could not come back to the United States. Thus, appellant acknowledged that if he went to El Salvador he would not be returning to care for Rachel.

{¶ 20} After considering the evidence presented at trial, the jury found appellant guilty of seven counts of rape and three counts of GSI. The trial court sentenced appellant to an aggregate prison term of 75 years to life, with eligibility of parole after 25 years. Appellant now timely appeals from his conviction and raises four assignments of error for our review.

**The Appeal**

{¶ 21} Assignment of Error No. 1:

{¶ 22} BARAHONA'S CONVICTIONS FOR RAPE ARE NOT SUPPORTED BY LEGALLY SUFFICIENT EVIDENCE.

{¶ 23} Assignment of Error No. 2:

{¶ 24} BARAHONA'S CONVICTIONS FOR RAPE ARE NOT SUPPORTED BY THE WEIGHT OF THE EVIDENCE.

{¶ 25} In his first and second assignments of error, appellant argues his convictions for rape were not supported by sufficient evidence and were against the manifest weight of the evidence. Appellant does not challenge the weight or sufficiency of the evidence with respect to his convictions for GSI.

{¶ 26} The concepts of sufficiency of the evidence and weight of the evidence are legally distinct. *State v. Wright*, 2014-Ohio-985, ¶ 10 (12th Dist.). Nonetheless, as this court has observed, a finding that a conviction is supported by the manifest weight of the evidence is also dispositive of the issue of sufficiency. *State v. Jones*, 2013-Ohio-150, ¶ 19 (12th Dist.). "Because sufficiency is required to take a case to the jury, a finding that

a conviction is supported by the weight of the evidence must necessarily include a finding of sufficiency." *State v. Hart*, 2012-Ohio-1896, ¶ 43 (12th Dist.).

{¶ 27} A manifest weight challenge scrutinizes the proclivity of the greater amount of credible evidence, offered at a trial, to support one side of the issue over another. *State v. Barnett*, 2012-Ohio-2372, ¶ 14 (12th Dist.). In assessing whether a conviction is against the manifest weight of the evidence, a reviewing court examines the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses, and determines whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Morgan*, 2014-Ohio-2472, ¶ 34 (12th Dist.).

{¶ 28} As noted above, appellant was convicted of seven counts of rape in violation of R.C. 2907.02(A)(1)(b), which provides in relevant part that "[n]o person shall engage in sexual conduct with another who is not the spouse of the offender . . . when . . . [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person."

{¶ 29} The term "sexual conduct" is defined by R.C. 2907.01(A) to include "the insertion, however slight, of any part of the body" into the "vaginal opening" of another. As this court has noted, "it is apparent that sexual conduct occurs when there is penetration of the vaginal opening by a penis or other body part." *State v. Zamora*, 2023-Ohio-1847, ¶ 7 (12th Dist.), citing *State v. Strong*, 2011-Ohio-4947, ¶ 53 (1st Dist.). This necessarily includes digital penetration of the victim's vaginal opening with a finger or fingers. *State v. Boles*, 2013-Ohio-5202, ¶ 38 (12th Dist.).

{¶ 30} Although not defined by the Ohio Revised Code, it is generally well established that penetration of a victim's "vaginal opening" has occurred where there was

some forceful spreading of the external female genitalia, or vulva, which is comprised of lip-like folds of skin called the labia majora. *Zamora* at ¶ 9. "'This penetration need only be slight, however,'" as "'[v]aginal penetration is proved when any object is applied with sufficient force to cause the labia majora to spread.'" *State v. Jackson*, 2023-Ohio-3749, ¶ 18 (12th Dist.), quoting *Zamora* at ¶ 9; *see also State v. Patterson*, 2021-Ohio-2387, ¶ 24 (5th Dist.). The labia majora is part of the external female genitalia. *Id.* Therefore, "although perhaps medically imprecise—legally, the vagina begins at the external genitalia, not some deeper internal structure." *State v. Artis*, 2021-Ohio-2965, ¶ 97 (6th Dist.).

{¶ 31} Based upon the definition of "sexual conduct" under R.C. 2907.01(A), appellant argues his rape convictions are against the manifest weight of the evidence and are not supported by sufficient evidence because the state failed to prove penetration of Rachel's vaginal opening occurred. Instead, appellant claims the evidence showed he simply "spread [Rachel's] labia and visually examined her without any penetration." We disagree with appellant's interpretation of the evidence.

{¶ 32} During her testimony, Rachel detailed seven separate encounters during which appellant conducted a "check" of her vagina. First, Rachel recalled appellant checking her while her mother was alive (Count 1). At that time, Rachel wanted to tell her mother, but did not because her mother "already had so much stuff on her . . . like, [appellant] hitting her and her dealing with cancer." Rachel also testified appellant instructed her not to tell her mother. Rachel next described appellant checking her vagina in her bedroom, as opposed to his bedroom as usual. (Count 3). During that check, appellant told her to take off her pants and proceeded to touch the "top lip" and "bottom lip" of her vagina. Rachel further testified to a time where, during his check, appellant "got [his finger] into the hole but then took it out and asked [Rachel] if [s]he was okay."

- 10 -

(Count 4). According to Rachel, this specific check was memorable because it hurt due to appellant's sharp nails.

{¶ 33} Rachel continued on to describe an occasion where appellant was touching the lips of her vagina during a check before he went "fast with his hand to try to put his finger up [her] private." (Count 5). Rachel indicated appellant was trying to get his finger in "her hole," but she stopped him. Another day, Rachel had finished playing with her friends at the park when appellant indicated he needed to "check [her] again, so [she] just did the same, take off [her] pants. Get on the bed. Spread [her] legs and he would touch [her] in [her] private." (Count 6).

{¶ 34} Rachel further testified that, during another instance where appellant was checking her vagina "like normal," i.e., that his fingers were in between the lips of her vagina, appellant discovered something white in Rachel's vagina (Count 7). Appellant took a photograph of her vagina and ultimately discovered the item was a piece of toilet paper. Lastly, Rachel detailed the final check conducted by appellant, where he was "check[ing] [her] like he normally" did before becoming aggravated and taking his pants off. (Count 8).

{¶ 35} Based upon Rachel's testimony, appellant claims the evidence is legally insufficient to show that he engaged in sexual conduct sufficient to prove a penetration finding. To support his claim, appellant initially highlights Rachel's testimony that appellant simply separated her "big lips" to look around, and "touched" the top and bottom lips of her vagina. However, when testifying about the rape underlying Count 4, Rachel specifically stated that appellant was conducting a check of her vagina when he placed his finger inside of her "hole." Rachel recalled this being painful. Similarly, in describing the rape underlying Count 7, Rachel testified that appellant's fingers were "between her lips" when he located the toilet paper in her vagina. The same is true for the rape

- 11 -

underlying Count 6, where Rachel testified appellant stated he needed to check her vagina, so she spread her legs, and he touched her "in" her private. This testimony, if believed, establishes appellant forcibly used his fingers to cause Rachel's labia majora to spread.

{¶ 36} Regarding Counts 3 and 5, appellant argues the events underlying those counts of the indictment do not constitute rape because Rachel was able to stop appellant from inserting his finger into "her hole" in Count 5 and merely described the touching of her vaginal lips in Count 3. However, throughout her testimony, Rachel consistently described what occurred during appellant's "checks" of her vagina. Rachel specifically stated that during a "normal" check of her vagina, Rachel would get on the bed, take off her pants, and appellant would use a spreading motion with his fingers to spread the "bigger lips," and then would "move" to the "smaller lips" and look around. Rachel also described this as appellant "opening her vagina" and specifically noted that a "normal" check of her vagina included appellant placing his fingers between her vaginal lips. In addition to the "normal checks," Rachel stated that appellant sometimes tried to put his finger "up [her] privates" or into her "hole" out of aggravation.

{¶ 37} Pursuant to this testimony, it is evident that each of the seven "checks" described by Rachel included, at a minimum, the spreading of her labia majora by appellant's fingers, but sometimes also included appellant's attempt to penetrate his fingers further into her vaginal opening or into her vaginal cavity. Because Rachel was able to stop appellant from further penetrating her vaginal opening does not render the initial penetration via the spreading of her labia majora with his fingers insufficient evidence of penetration under R.C. 2907.01(A). As noted above, "the vagina begins at the external genitalia, not some deeper internal structure." *Artis*, 2021-Ohio-2965 at ¶ 97. To the extent appellant claims otherwise, such argument lacks merit.

{¶ 38} Moreover, we reject appellant's argument that Rachel's testimony merely established appellant touched Rachel's vaginal lips, not that he inserted any body part or object into her vaginal opening. Although Rachel occasionally used the term "touch," as opposed to insert, when describing appellant's actions during the digital rapes, a jury could reasonably conclude that appellant necessarily inserted part of his finger into Rachel's vaginal opening when he "opened" her vagina by spreading the lips of her vagina with his fingers. *See State v. Rowland*, 2020-Ohio-2984, ¶ 21 (12th Dist.). Such an action would undoubtedly cause the labia majora to spread.

{¶ 39} Regarding the remaining allegations of rape underlying Counts 1 and 8 of the indictment, we acknowledge that Rachel did not expressly state that appellant had either touched or inserted his fingers "in between" her vagina's lips. This is of no consequence, however, given that Rachel testified that appellant conducted a normal or typical check of her vagina during those encounters. *See Zamora*, 2023-Ohio-1847 at ¶ 12 (the victim's failure to expressly state that digital penetration occurred "in between" her vagina's lips was inconsequential where she testified that each of the rapes were the same). As discussed above, Rachel consistently described appellant's typical check of her vagina, which involved appellant checking "the cleanliness" of her vagina after she took off her pants, lay on his bed, and spread her legs. Appellant would then conduct the check by using a spreading motion with his finger to "open" her vagina. Rachel utilized a tissue box to demonstrate the spreading motion for the jury. Although appellant would simply "look around" after the spreading occurred, this fact does not negate that he used his fingers beforehand and forcibly caused the labia majora to spread.

{¶ 40} After reviewing the record, weighing inferences and examining the credibility of the witnesses, we conclude the jury's verdicts are supported by sufficient evidence and are not against the manifest weight of the evidence. The jury did not clearly

lose its way in concluding that appellant was guilty of rape. While appellant argues that the "weight of the evidence on the majority of the rape counts shows that there was no penetration as a matter of law," we find that the record contains sufficient credible evidence from which the jury could reasonably conclude that appellant was guilty. Specifically, the state presented the testimony of the victim, which, if believed, supports the conclusion that penetration, which need only be slight, occurred on at least seven occasions. The victim's testimony was partially corroborated by other witnesses at trial, including appellant himself. Although appellant denied touching Rachel between her legs, the jury, as trier of fact, was in the best position to weigh the credibility of the witnesses. Following the presentation of all the evidence, the jury found the victim to be more credible than appellant. The jury sitting as factfinder was in a better position to observe the demeanor of the witness and determine the weight to be afforded her testimony. In so doing, the jury must have found Rachel's description of the events more credible than that of appellant's. "[W]hen conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the tier of fact believed the prosecution testimony." *State v. Doyle*, 2021-Ohio-4243, ¶ 47 (12th Dist.).

{¶ 41} Accordingly, we find that appellant's convictions for rape are supported by sufficient evidence and are not against the manifest weight of the evidence. Appellant's first and second assignments of error are therefore, overruled.

{¶ 42} Assignment of Error No. 3:

{¶ 43} THE TRIAL COURT PLAINLY ERRED WHEN IT ALLOWED THE STATE TO PRESENT EVIDENCE OF BARAHONA'S TRAVEL ARRANGEMENTS.

{¶ 44} In his third assignment of error, appellant argues the trial court plainly erred when it allowed the state to present evidence of his travel arrangements.

{¶ 45} When properly objected to, this court reviews a trial court's decision to admit

or exclude evidence under an abuse of discretion standard. *State v. Gerde*, 2017-Ohio-7464, ¶ 8 (12th Dist.). Appellant, however, did not object to any of the testimony and evidence of which he now complains. By failing to object, appellant has waived all but plain error on appeal. *State v. Grimm*, 2019-Ohio-2961, ¶ 21 (12th Dist.). Pursuant to Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." An error does not rise to the level of a plain error unless, but for the error, the outcome of the trial would have been different. *State v. Palmer*, 2014-Ohio-5491, ¶ 21 (12th Dist.). "'Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *State v. Harner*, 2020-Ohio-3071, ¶ 24 (12th Dist.), quoting *State v. Landrum*, 53 Ohio St.3d 107, 111 (1990).

{¶ 46} In this case, the state presented testimony from several witnesses that appellant planned to flee the country. This included the investigator's testimony regarding the search of appellant's home, during which officers located several items suggesting that appellant planned to travel to El Salvador indefinitely just two days later. Specifically, officers discovered and photographed two suitcases packed full of sentimental items like pictures, cards, and notes from his former-wife and Rachel, as well as toiletries and other necessities; three fully executed car titles; and a hidden folder containing appellant's Covid-19 vaccination record, appellant's passport, and flight details in appellant's name for an upcoming trip to El Salvador. The investigator testified he later confirmed there was no existing return flight for appellant from El Salvador. Throughout the investigator's testimony, the state presented several photographs taken by the officers executing the search warrant, which were admitted into evidence without objection.

{¶ 47} Defense counsel questioned appellant during direct examination regarding the plane ticket, during which appellant conceded he purchased the plane ticket but

claimed he simply wanted to visit his mother. During cross-examination, appellant acknowledged he planned to travel to El Salvador despite the ongoing investigation and that he could not return to the United States if he went to El Salvador due to his illegal status.

{¶ 48} At the close of the state's presentation of the evidence, the trial court noted on the record that it was inclined to include a flight instruction based upon the evidence presented. At that point, defense counsel objected to the inclusion of any flight instruction given appellant's lack of actual flight. The trial court overruled defense counsel's objection and instructed the jury that it could consider appellant's preparation to flee the country as evidence of his consciousness or awareness of guilt.

{¶ 49} On appeal, appellant does not challenge the flight instruction provided by the trial court, but instead argues the trial court erred in admitting evidence concerning his plans to travel to El Salvador. Appellant claims the evidence should not have been permitted because he was not charged with a fleeing offense and his alleged attempt to flee was not an element of rape or GSI. Appellant further argues the introduction of such evidence was barred by Evid.R. 403, as it was highly prejudicial to appellant, and only suggested to the jury that his efforts to leave the country were evidence of his guilt. After our review, we find no merit to appellant's claim.

{¶ 50} Although appellant is correct that an attempt to flee is not an element of rape or GSI, it is "universally conceded" that evidence of flight is admissible as evidence of consciousness of guilt. *State v. Williams*, 79 Ohio St. 3d 1, 11, 1997-Ohio-407; *see also State v. Hand*, 2006-Ohio-18, ¶ 167 ("an accused's flight . . . and related conduct, are admissible as evidence of consciousness of guilt, and thus guilt itself"). "Flight means some escape or affirmative attempt to avoid apprehension." *State v. Herrell*, 2017-Ohio-7109, ¶ 24 (6th Dist.), citing *State v. Wesley*, 2002-Ohio-4429, ¶ 19 (8th Dist.). To

constitute "flight," the defendant must "appreciate that he has been identified as a person of interest in a criminal offense and is taking active measures to avoid being found." *State v. Sanchez-Sanchez*, 2022-Ohio-4080, ¶ 177 (8th Dist.). Flight need not be immediately after the crime and includes flight from subsequent arrest. *State v. McDonall*, 2018-Ohio-2065, ¶ 47 (8th Dist.).

{¶ 51} When considering the evidence presented by the state, it is clear appellant was planning to flee to avoid apprehension and subsequent arrest. Although it is true that appellant had not been formally charged when officers discovered appellant's intention to flee the country, the record reflects appellant was aware of the nature of Rachel's allegations against him at that time. In fact, by December 2, 2022 CPS had initiated proceedings to remove Rachel from appellant's care based upon her allegations. Moreover, appellant made comments to a family friend that he was either going to jail or back to his home country, which suggests he was aware of the forthcoming charges and his inevitable arrest. While executing the search warrant, officers located several items indicating appellant intended to leave for El Salvador indefinitely, and appellant himself confirmed his travel plans. This evidence establishes appellant's intention to avoid apprehension, which was admissible to establish a material issue in dispute, i.e., appellant's consciousness of guilt or guilt itself. *Williams* at 11.

{¶ 52} Although appellant argues this evidence is highly prejudicial and outweighs its probative value, merely unfavorable evidence is not equivalent to unfairly prejudicial evidence. *State v. Bowman*, 144 Ohio App. 3d 179, 185 (12th Dist. 2001). "The exclusion of relevant evidence under Evid.R. 403(A) requires more than mere prejudice, because anything adverse to a party's case could be deemed prejudicial to that party." *State v. Worley*, 2021-Ohio-2207, ¶ 125. Instead, unfair prejudice is "that quality of evidence which might result in an improper basis for a jury decision. Consequently, if the evidence

arouses the jury's emotional sympathies, evokes a sense of horror, or appeals to an instinct to punish, the evidence may be unfairly prejudicial." *State v. Crotts*, 2004-Ohio-6550, ¶ 24.

{¶ 53} Here, appellant has not shown that the evidence unfairly prejudiced him or appealed to the jury's emotions. Although the evidence is not particularly favorable to appellant, it is not of such quality that it could result in an improper basis for the jury's decision. This is especially true where the jury could have found appellant guilty based upon the victim's testimony alone. *State v. Woodward*, 2011-Ohio-6019, ¶ 23 (12th Dist.).

{¶ 54} Moreover, the record reflects the trial court took steps to minimize the danger of unfair prejudice and to ensure that the evidence was considered only for the proper purpose. *State v. Hartman*, 2020-Ohio-4440, ¶ 34. As the Ohio Supreme Court has held, "an appropriate jury instruction geared toward the specific purpose for which the evidence has been admitted will help reduce the risk of confusion and unfair prejudice." *Id.* The trial court issued such an instruction in this case, and specifically instructed the jury to consider the pertinent evidence only to prove appellant's consciousness of guilt, and not for any other purpose. The jury is presumed to have followed that instruction. *State v. Tyree*, 2017-Ohio-4228, ¶ 16, 20 (12th Dist.).

{¶ 55} Accordingly, we conclude that the probative value of the relevant evidence was not outweighed by the danger of unfair prejudice to appellant. As such, the trial court did not commit plain error in admitting evidence concerning appellant's travel plans to establish his consciousness of guilt.

{¶ 56} Therefore, appellant's third assignment of error is overruled.

{¶ 57} Assignment of Error No. 4:

{¶ 58} BARAHONA'S DEFENSE WAS PREJUDICED BY INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL.

**{¶ 59}** In his remaining assignment of error, appellant argues that his trial counsel was ineffective because he (1) failed to move for a mistrial based upon prosecutorial misconduct, (2) failed to object to evidence that appellant wanted to leave the country, and (3) failed to object to the playing and admission of the redacted version of Rachel's forensic interview at the Mayerson Center.

**{¶ 60}** To establish ineffective assistance of counsel, appellant must show (1) deficient performance by counsel, that is, performance falling below an objective standard of reasonable representation, and (2) prejudice, that is, a reasonable probability that but for counsel's errors, the result of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-688, 694 (1984); *State v. Mundt*, 2007-Ohio-4836, ¶ 62. A "reasonable probability" is a probability that is "sufficient to undermine confidence in the outcome." *Strickland* at 694. An appellate court must give wide deference to the strategic and tactical choices made by trial counsel in determining whether counsel's performance was constitutionally ineffective. *Id*. at 689. The failure to satisfy either prong of the Strickland test is fatal to an ineffective assistance of counsel claim. *State v. Petit*, 2017-Ohio-633, ¶ 39 (12th Dist.).

**{¶ 61}** Appellant initially argues his counsel was ineffective because he failed to move for a mistrial after the prosecutor engaged in an inappropriate conversation with a courtroom spectator. The record reveals that on the second day of trial, after Rachel's testimony and in the presence of the jury, an unidentified spectator asked the trial judge if he objected to the spectator's presence in the courtroom. The spectator stated that "the prosecuting counselor said that [the court] found it weird" that he was present. The trial judge responded that this was not the prosecutor's courtroom, and that he did not object to the spectator's presence, as the courtroom is a public place where the spectator was allowed to visit. Later, outside the presence of the jury, the prosecutor discussed the

spectator's presence in the courtroom, and clarified that the spectator was a friend of a defendant in another case and was present that day because his friend's case was continued. The prosecutor stated that she told the spectator that it was weird that he watched Rachel testify. The prosecutor later learned that the spectator "announced to the jury and the entire courtroom" that she had said something to him. In response, the trial judge reprimanded the prosecutor for speaking to the spectator, and indicated if she had an issue with someone, she was to speak with court personnel.

{¶ 62} The trial court later, at the prosecutor's request, discussed the spectator's presence in the courtroom with the jurors. The trial court explained that the spectator was in the courtroom for sentencing on a case that was completely unrelated to appellant's case and was continued to another day. The trial court then instructed the jurors to disregard any comments they may have heard about a discussion with the prosecutor, as well as any comments made by the spectator and the trial judge in response. At that point, the proceedings continued without any objection by either party.

{¶ 63} Appellant contends his trial counsel was deficient when he "stood silent" and "did not object or move for a mistrial" throughout the above interactions between the prosecutor, the trial judge, and the jurors, which appellant categorizes as "prosecutorial misconduct." After our review, we disagree.

{¶ 64} "[W]hether or not to move for a mistrial is a tactical decision and is well within the range of competent assistance of counsel." *State v. Gilbert*, 2011-Ohio-4340, ¶ 83 (12th Dist.). Mistrials are only declared "when the ends of justice so require and a fair trial is no longer possible." *State v. Garner*, 74 Ohio St.3d 49, 59, 1995-Ohio-168.

{¶ 65} Similarly, "the focus of an inquiry into allegations of prosecutorial misconduct is upon the fairness of the trial, not upon the culpability of the prosecutor." *State v. Gray*, 2012-Ohio-4769, ¶ 57 (12th Dist.). Notably, the failure to object to

prosecutorial misconduct "does not constitute ineffective assistance of counsel per se, as that failure may be justified as a tactical decision." *State v. Gumm*, 73 Ohio St.3d 413, 428, 1995-Ohio-24. A finding of prosecutorial misconduct will not be grounds for reversal unless the defendant has been denied a fair trial because of the prosecutor's prejudicial remarks. *State v. Layne*, 2010-Ohio-2308, ¶ 60 (12th Dist.).

{¶ 66} In this case, appellant has failed to prove that the prosecutor's comments to the spectator prevented appellant from receiving a fair trial or otherwise affected the outcome of trial. A review of the interactions between the spectator, the trial judge, and the prosecutor indicates the encounter in front of the jury was de minimis and immaterial to the outcome of the trial. The spectator did not reveal any information regarding the case, nor did he offer his opinion on the evidence, issues, parties, or possible outcome. Instead, the spectator simply asked the trial judge if he was permitted to remain in the courtroom, to which the trial court responded affirmatively. Accordingly, because the interaction that occurred was very brief and had no relevancy to appellant's trial, we see no grounds for a mistrial.

{¶ 67} Furthermore, appellant has not shown that counsel's failure to object to the prosecutor's comments prejudiced his defense. Instead, appellant speculates that by allowing a curative instruction without any objection, defense counsel permitted the prosecutor to remain in a favorable light with the jury. This claim is entirely premised on speculation, which is insufficient to establish an ineffective assistance claim. *State v. Short*, 2011-Ohio-3641, ¶ 119 (mere speculation cannot support either the deficient-performance or prejudice requirements of an ineffective-assistance claim). Moreover, such speculation is simply not supported by the record where the trial court plainly reprimanded the prosecutor for her comments in front of the jury, allowed the spectator to remain in the courtroom against the prosecutor's wishes, and instructed the jury to

disregard any comments about the spectator's presence in the courtroom.

{¶ 68} Lastly, contrary to appellant's claim otherwise, any prejudice suffered by appellant was remedied by the trial court's supplemental instruction to the jury. It is well settled that curative instructions "are presumed to be an effective way to remedy errors that occur during trial." *State v. Trzeciak*, 2015-Ohio-2219, ¶ 24 (12th Dist.). A jury is presumed to follow the court's instructions, including curative instructions, and the record reveals no evidence that the jury failed to follow the trial court's instructions or gave any thought to the spectator's comments. *Tyree*, 2017-Ohio-4228 at ¶ 20. Therefore, appellant's counsel was not ineffective for choosing not to object to, or move for a mistrial based upon, the prosecutor's comments.

{¶ 69} Appellant next argues he received ineffective assistance of counsel when his trial counsel failed to object to evidence that appellant prepared to leave the country. However, as this court has already discussed more fully above in appellant's third assignment of error, the trial court did not err in admitting evidence of appellant's plan to evade law enforcement by fleeing the country. Counsel cannot be ineffective for failing to object to admissible evidence. *State v. Skatzes*, 2004-Ohio-6391, ¶ 218. As such, counsel could not have been deficient in failing to object to the admission of the flight evidence.

{¶ 70} Appellant lastly contends that his counsel was ineffective in agreeing to a playback of the redacted version of Rachel's forensic interview at trial. Specifically, appellant claims that, although some of Rachel's statements during the video were made for medical diagnosis or treatment, some were clearly inadmissible hearsay. However, regardless of whether the statements made during the forensic interview constitute hearsay or not, appellant has failed to establish he was prejudiced by their admission. In fact, appellant fails to identify any particular statement which he claims to be prejudicial,

only that the statements were made during the forensic interview. It is not this court's responsibility to identify the testimony and evidence to determine which statements appellant believes were objectionable. *State v. Philpot*, 2024-Ohio-2596, ¶ 32 (12th Dist.). Rather, it is appellant's burden to establish prejudice. *Strickland*, 466 U.S. at 687. This court will not construct an argument on his behalf. *See* App.R. 16(A)(7) (requiring appellant's brief to include an argument containing the appellant's contentions with respect to each assignment of error presented for review and "the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies"). Because appellant has not met his burden, this court rejects his argument regarding counsel's failure to timely object to the alleged hearsay statements.

{¶ 71} We furthermore note that, insofar as the contents of the redacted forensic interview may have been inadmissible, any such admission constitutes harmless error where Rachel testified at trial and was subject to cross-examination. *State v. Davis*, 2024-Ohio-1504 (5th Dist.). Additionally, because Rachel testified and the statements elicited during her forensic interview were merely cumulative of statements Rachel made during her testimony, their admission would be harmless even if they had been admitted in error. *Philpot* at ¶ 32, citing *State v. Smith*, 2020-Ohio-4008, ¶ 46 (12th Dist.). Thus, appellant cannot demonstrate that but for the admission of the interview, the jury verdict would be different. Accordingly, trial counsel's failure to object to the playback and admission of the forensic interview did not amount to ineffective assistance of counsel.

{¶ 72} Based on all the foregoing, we conclude that appellant has failed to show that his counsel's performance was deficient or that he suffered any prejudice as a result of the alleged deficiencies. Accordingly, we overrule appellant's fourth assignment of error.

{¶ 73} Finding no merit to any of appellant's arguments raised on appeal, we affirm

the judgment of the trial court.

**{¶ 74}** Judgment affirmed.


S. POWELL, P.J., and BYRNE, J., concur.